## McCULLOCH v. MURPHY et al.

### (Circuit Court, D. Nevada. September 26, 1903.)

### No. 751.

1. MINING CLAIMS—LOCATION BY AGENT—VALIDITY.
   There is no provision of law prohibiting the location of a mining claim or the doing of any of the acts required to complete the appropriation by an agent, and the fact that the locator acted by agent in such matters does not invalidate the location.

2. SAME—ASSESSMENT WORK—EVIDENCE.
   The object of the statutory provision requiring annual assessment work on mining claims is to give substantial evidence of the locator's good faith, and the law should be liberally construed with that end in view; a compliance with the statute may be proved by any evidence which establishes that the work done and improvements made are reasonably worth the sum of $100.

3. SAME—EFFECT OF RECORDING STATUTE.
   The Nevada statute (St. 1887, p. 136, c. 143), providing for the recording of evidence of the doing of the annual assessment work on mining claims, is designed merely to preserve such evidence, and the failure to record the prescribed affidavit does not preclude the owner of a claim from making the necessary proof of work by any other evidence; nor is the record proof, if made, conclusive.

4. SAME—FORFEITURE—BURDEN AND MEASURE OF PROOF.
   The burden of proving an abandonment of a mining claim, or that the required annual assessment work has not been done, so as to render it subject to relocation, rests on the party asserting it, and the proof must be clear and convincing to establish a forfeiture.

5. SAME—ASSESSMENT WORK—EVIDENCE CONSIDERED.
   Evidence considered, and *held* to establish by a preponderance of proof the validity of a mining location by defendants, and that the required assessment work was done in a certain year, which rendered void a relocation of the claim by plaintiff in the following year.

Suit to Quiet Title to Mining Claim.

Samuel Platt, for plaintiff.
J. F. Dennis, for defendants.

HAWLEY, District Judge (orally). Plaintiff, claiming to be the owner of the Copper King mine, in the Battle Mountain mining district, in Lander county, Nev., commenced this suit, and obtained an injunction against defendants enjoining them from entering into or upon any portion of said mining claim, or taking any ores or minerals therefrom, and prayed to have the title to said mine quieted by a decree. The answer denies the material allegations of the complaint, and alleges ownership and title in themselves to the ground in controversy. A mass of testimony was introduced, which covered a wide range over minor details, and upon these points there was more or less conflict, and much confusion in the testimony, especially upon the part of some of the witnesses introduced by the defendants.

The real and controlling question in the case is whether or not at the time that plaintiff made his relocation of the ground in controversy it was vacant, unoccupied mineral land, open to location and occupancy as such. The plaintiff in his testimony made out a clear case in his favor. He testified that in the year 1882 he was engaged in prospect-

ing in the Battle Mountain mining district as a miner; that he located the ground in dispute and worked upon the same within the boundaries of the ground now known as the "Copper King Mine"; that he, and others in his employ, dug a cut 53 feet long, ran an incline, and dug other cuts; that he then left the ground, and abandoned it; that in September, 1902, he returned to said mining district, and visited the ground in dispute, with a view of locating the ground upon which he had worked 20 years before; that he examined the place, and found but little work in addition to what he had done thereon in 1882; that he made inquiries and examined the mining records of the district, and became satisfied that the ground had been abandoned, and was vacant, and that the locations made thereon had been forfeited from lack of discovery and assessment work; that he located the ground on the 22d of September, 1902, as the Copper King mining claim. His notice of location, which contained a description of the ground by metes and bounds, was recorded in the mining records of the district December 4, 1902. His testimony showed that under this location he had taken all the steps required by law by posting his notice, building monuments, and performing discovery and assessment work thereon, etc. He introduced in evidence a certificate of the district recorder, which reads as follows:

"The Copper Glance mining claim was located on the 19th day of September, 1900. Recorded on 23rd day of October, 1900. The record does not show assessment work for the year 1901 on the Copper Glance mining claim. I hereby certify that the above is correct and true.
"C. F. Mellander, District Recorder."

W. W. Coleman, a surveyor and mining engineer, was introduced, and produced a map of the ground, designating the lines and boundaries thereof, and the places where excavations, drifts, tunnels, inclines, and cuts had been made, and giving in detail the character and dimensions thereof, and was permitted as an expert to give his opinion as to the age of such excavations, and gave it "at about ten years." Among other points, he testified to the existence of an open cut 53 feet long, "from the entry or where it commences at the slope of the hill to the face of the cut or the entry of the tunnel. * * * The tunnel is twenty feet six inches long from the entry to the face, approximately six feet in height, four feet in width at the base. * * * The physical condition of the cut is apparently the same as the other workings I have described. The tunnel itself seems to be of recent construction, and the cut has caved somewhat on the sides above the rock through which the cut has been excavated. There is disintegrated material that has caved down in, and there are bushes growing up through the waste material that has been thrown out apparently in running this cut. They have dug a trench, and thrown the waste material out, and the bushes have grown out from that as they have through the other workings described." He further testified that the age of the cut would be about 10 years; that there is a strong contrast between the ages of the tunnel proper and the cut—a decided difference. The cut is apparently much older than the tunnel itself.

The defendants claim title to the ground under locations made by or for them (1) to the Copper Glance, located by Cornelius Murphy on

the 19th day of September, 1900, and notice of location thereof recorded October 13, 1900; (2) to a relocation of the ground under the name of Defender, made by H. R. Lemaire on August 9, 1901, and recorded November 22, 1901.

It is admitted by plaintiff that the boundary lines of the Copper King and the Copper Glance are substantially identical. It is suggested by plaintiff that the Copper Glance claim was never properly located, and that there is a variance between the allegations of the complaint and the proofs in this: that it appears from the complaint that the location was made by one Cornelius Murphy, and the proofs show that M. J. Murphy was the original discoverer of the lode, and that the location was made by Cornelius Murphy as an agent. The testimony of defendants upon this point is to the effect that it was agreed by the parties interested in the location what their interests should be, and that the claim should be located for them by Cornelius Murphy. There is nothing in the mining laws that prohibits one from initiating a location of a mining claim by an agent. It is not necessary that a party should personally act in taking up a mining claim, or in doing the acts required to give evidence of the appropriation, or to perfect the appropriation. The suggestions made by counsel do not, in any manner, affect the validity of the Copper Glance claim. 1 Lindley on Mines (2d Ed.) § 331, and authorities there cited.

The object of the law in requiring annual assessment work to the extent of $100 on the claim is that the owner shall give substantial evidence of his good faith. A liberal construction must be given to the requirements of the law. The labor and improvements, within the meaning of the statute, should be deemed to be done when the labor is performed or improvements made, for the purpose of working, prospecting or developing the mining ground embraced in the location, or for the purpose of facilitating the extraction or removal of the ore therefrom. St. Louis Smelting & Refining Co. v. Kemp, 104 U. S. 636, 655, 26 L. Ed. 875; Book v. Justice M. Co. (C. C.) 58 Fed. 106, 117, and authorities there cited.

The method of proof usually required to establish the fact that the amount of labor for the annual assessment has been done is not uniform. Mere proof of the expenditure of $100 is not, of itself, sufficient, but it furnishes an element tending strongly to establish the good faith of the owner. One of the main tests of determining this question is not what was paid for it, or the contract price, but whether or not the labor, work, and improvements "were reasonably worth the said sum of one hundred dollars." In addition to cases before cited, see Mattingly v. Lewisohn, 13 Mont. 508, 520, 35 Pac. 111; Penn v. Oldhauber, 24 Mont. 287, 291, 61 Pac. 649; Quimby v. Boyd, 8 Colo. 194, 208, 6 Pac. 462; Wright v. Killian, 132 Cal. 56, 64 Pac. 98.

The testimony concerning the amount of labor performed furnished a wide field of controversy, and an opportunity for a broad difference of opinion as to the value of the work. There is always a conflict as to the actual or reasonable value of the labor. It has been said— and a wide experience in such cases has convinced the court of its truth—that every relocator is interested in depreciating the value of

the work performed by the original locator, and the latter in saving his claim from forfeiture is interested in extolling his work. The case in hand certainly forms no exception to this general rule. In cases of a conflict upon this point, it is always proper to consider whether there has been a bona fide attempt to comply with the law. The certificate of the district mining recorder that the records do not show assessment work for the year 1901 on the Copper Glance mining claim is at best only prima facie evidence of the fact, subject to be rebutted by oral or other testimony. No penalty is attached to the failure of having the record show that the work was done. There is no provision in any of the statutes bearing upon this subject which declares that such a failure to have the proper certificate recorded will work a forfeiture of the claim.

In Book v. Justice M. Co., supra, the court, referring to the statute of Nevada (St. 1887, p. 136, c. 143), said:

"The object of this act was evidently to fix some definite way in which the proof as to the performance of the work or expenses incurred in the making of improvements might be, in many cases, more accessible. In all mining communities there is liable to be some difficulty in finding the men who actually performed the labor or made the improvements, and procuring their testimony, in order to establish the facts necessary to show a compliance with the mining laws in this respect. The act was passed, as expressed in the title, 'for the better preservation of titles to mining claims.' Locators of mining claims would doubtless often save much time and trouble, as well as hardship, inconvenience, and expense, by complying with the provisions of this act; but the act does not prevent, and was not intended to prohibit, the owner of a mining claim from making the necessary proof in any other manner, nor does it prohibit the contesting party from contradicting the facts stated in the affidavit. It simply makes the record prima facie evidence of the facts therein stated."

It is perhaps safe to say that if the defendants in the present case had filed their affidavits in the district recorder's office, as required by the statute of this state, no relocation would have been made by the plaintiff.

The law does not favor forfeitures. The penalty for failure to comply with the law is thus expressed in section 2324, Rev. St. [U. S. Comp. St. 1901, p. 1426]: "Upon a failure to comply with these conditions, the claim or mine upon which such failure occurred shall be open to relocation in the same manner as if no location of the same had ever been made." The word "forfeiture" is not used in the statute, although it is a comprehensive word to express results which flow from a failure to comply with the law. The rule is well settled that the forfeiture cannot be established except upon clear and convincing proof of the failure of the original locator to have work performed or improvements made to the amount required by law. The burden of proof to establish a forfeiture rests upon him who asserts it. Hammer v. Garfield M. & M. Co., 130 U. S. 291, 301, 9 Sup. Ct. 548, 32 L. Ed. 964; Book v. Justice M. Co., supra; Justice M. Co. v. Barclay (C. C.) 82 Fed. 554, 559; Emerson v. McWhirter, 133 Cal. 510, 65 Pac. 1036; Axion M. Co. v. White, 10 S. D. 198, 201, 72 N. W. 462. The law is well settled that actual possession of a mining claim is not essential to the validity of a title obtained by a valid location; that until such location is terminated by abandonment or forfeiture

no right or claim to the property can be acquired by an adverse entry thereon with a view to the relocation thereof. Belk v. Meagher, 104 U. S. 279, 283, 284, 26 L. Ed. 735.

The legal principles herein announced are elementary, and I have not deemed it necessary to elaborate them, or take the pains to cite all the authorities. They are abundant. Keeping in mind the settled rules of law as to posting notices, the placing of stakes, building monuments, replacing or moving them, the discovery of mineral, and the liberality of the construction to be given to these acts of the miner, as announced in Book v. Justice M. Co., supra, and supplemented by the authorities cited upon these subjects in Walton v. Wild Goose M. & T. Co. (C. C. A.) 123 Fed. 209, 218, I have no hesitation in saying that the Copper Glance was a valid location, and that all the steps required by law to be performed thereon were complied with in the year 1900. The whole case resolves itself into the question whether the annual assessment work was done by the defendants during the year 1901. It is argued by plaintiff that the testimony on behalf of the defendants was given in such a manner as to raise a doubt and uncertainty touching the main question, and that as given it is entitled to but little, if any, weight. The confusion of the principal witness upon the part of the defendants on this point suggests the only doubt that arises in the case. He was possessed of ordinary intelligence, and seemed capable of giving his testimony in a proper manner, but he became embarrassed, bewildered, and could not be confined by the court or counsel to a mere statement of the facts as they occurred. He was disturbed by questions asking him to explain his testimony by the map made on behalf of plaintiff of the ground, which he did not understand, and made mistakes in answering them, much to the chagrin of his counsel, and at times lost his bearings upon many of the essential points. It was a case of dumb confusion worse confounded by the surroundings of the trial. It seemed to be impossible for him to make any connected statement concerning any particular subject without wandering off upon irrelevant matters. The court at divers times attempted to assist the witness, and get him to state the facts in his own way, and confine himself to his own knowledge of what actually occurred; but all efforts in this direction for a day or two, at least, proved as fruitless as the efforts made in that direction by counsel. A reference to one statement made by the court, as shown by the record, as to where the stakes and monuments were placed, illustrates the whole difficulty which arose from his testimony upon all the points involved at the trial, namely: "We are having difficulty apparently in getting at the facts all around. The witness is not specific enough; he jumps from one corner to the other, and in a way that is difficult to understand." After vain efforts to testify from the map, he produced a little timebook, wherein he had kept the time of himself and employés, from which he testified that, in 1901, he, his brother Con, Fred Barnes, and one Uren performed 60 days' labor upon the Copper Glance mine in cleaning out an open cut and running a tunnel. There was some conflict as to whether the open cut was the same as that testified to by plaintiff as having been made by him in 1882, some of the witnesses for defendants stating that it was not; but, for the

purpose of this opinion, it will be conceded that it was; but there was no pretense that the tunnel part was constructed by the plaintiff. This tunnel, as testified to by defendants' witnesses, was 24 feet in length from the open face, 4 feet wide, and 6 feet deep. The witness Murphy testified that the ground was in hard rock, and that a man might drive 6 or 8 inches of the tunnel in a day, and in some places might make a foot per day; that the men worked 8 hours a day, and the employés were paid regular miners' wages. In justice to this witness, whose testimony I have criticised, it is proper to state that he impressed me as desiring to tell the truth, and was always willing to explain his testimony, and admitted that he had not understood the questions, and had made mistakes or was misunderstood by the court and counsel. His greatest fault was in not confining himself specifically to the questions asked as to the month and year when, and place where, the annual assessment work was done. For this reason I have confined myself to a general statement gleaned from his whole testimony, and have confined myself to the year 1901. During the course of his testimony he testified that the Defender and Copper Glance run parallel:

"Q. Now, Mr. Murphy, is this work upon the Copper King mine, designated by the red figures 1, 2, 3, 4, 5, 6, 7, and 8 upon plaintiff's map, is not that work performed substantially upon the Copper Glance mining claim? A. Yes, sir. Q. Is it not all within the boundaries of what you claim to be the Copper Glance mining claim? A. Yes, sir. Q. Is there any portion of the work performed and represented upon that map upon the Defender mining claim? A. No, sir. Q. Who performed the location work upon the Copper Glance mining claim in the year 1900? A. I did. Q. You did personally? A. Mr. Holcomb and Mr. Barnes and I; I employed Mr. Barnes."

His attention was then called to plaintiff's map, and he was asked where the work was performed at the incline:

"A. Twenty-four or twenty-five feet from the top of this incline there is a cut running east and west. * * * Q. Upon the incline? A. Yes, sir; in the incline. Q. In the incline you made a cut? A. Yes, sir. Q. How long was that cut? A. The west cut is about five or six feet, and the other probably about four feet—four or five feet. Q. Now, Mr. Murphy, you testified in direct examination that in the year 1900 you and a company of others were upon the claim known as the Copper Glance mining claim, and cleaned out all the inclines, tunnels, cuts, and workings which had been performed by somebody else? * * * Your testimony shows that you did that in the year 1900. A. Yes, sir. * * * And also this work I described in the incline. Q. That was all done in the year 1900? A. Yes; I done all this work in the year 1900. * * * Q. I wish you would state when you began to do your assessment work for the year 1901 on the Copper Glance? A. In 1901 I commenced on the 7th day of October. Q. What did you do toward the performance of the assessment work? * * * A. We still continued the cut; the object was to tap this shaft. * * * Q. The assessment work that you did was a continuation of that cut that you have just been talking about? A. Yes, sir; and the tunnel. * * * Q. How much of the cut which you say that you dug as a continuation of the original cut of eighty feet long, how much of that did you complete in the year 1901? A. Well, it would be I think * * * about eighty feet, must have about sixty feet of tunnel and open cut, and there is a portion of that work that was done in the year 1902—this four feet that we speak of added to it. Q. You now testify that sixty feet of that work was the assessment work upon the Copper Glance? A. There was five or six men working, * * * all worked in this cut. Q. When you testified, Mr. Murphy, that Mr. McCulloch was correct when he

stated that the cuts and the inclines were built about ten years ago, what did you mean? A. I mean those that surrounded the incline; that is, 1, 2, and 3."

The attention of the witness was then called to his previous testimony, that the 80-foot cut was at the point marked "7" on plaintiff's map:

"Q. I point out to you upon the map the red number 7, which you testified positively was the cut upon which that work was performed. A. I testified positively to this work on my map, known as the eighty-foot cut. Q. Then when you testified that you performed that work—that assessment work—upon the cut marked upon plaintiff's map as No. 7, * * * you were mistaken? A. I testified positively I worked here (pointing to his own map). I don't go on that map. I told you I didn't understand that map, and the judge allowed me to use this map, and I confined myself to this map. I superintended and oversaw all of that work from the time the first pick was stuck until the year 1902. Q. How much work did you do on the Defender—how much assessment work? A. Ran an open cut on the Defender, running about twenty feet; it is twenty feet from the cut which Mr. McCulloch put in, and it is about twenty-three feet, with a little over ten foot face in solid ore. Q. When did you commence that work? A. In the year 1901. Mr. Barnes worked with me on that, too; Mr. Barnes, I think, worked on that claim about fifteen days. * * * I worked with him myself. Q. How long a cut did you dig? A. About twenty-three feet long."

The testimony of this witness was corroborated by other witnesses on several of the essential points. Notwithstanding the confusion of the principal witness for the defendants, and the conflict raised as to the amount of assessment work done on the Copper Glance in 1901, there is nothing in the evidence justifying the inference that there was any intention on the part of the defendants to evade the law or come short of its requirements. It is no doubt true that the provision of the law as to assessment work is often evaded, and locators must be made to understand that the conditions imposed by the act of Congress and by the statutes of Nevada are wise and salutary, are not onerous, and must be complied with.

As was said in Sisson v. Sommers, 24 Nev. 379, 387:

"To enable a party to maintain a right to a mining claim after the right is acquired, it is necessary that the party continue substantially to comply, not only with the laws of Congress, but with the valid laws of the state and valid rules established by the miners, in force in the district where the claim is situated upon which such right depends."

With reference to the amount of assessment work done by the defendants in the year 1901 upon the Copper Glance, which is the controlling question in this case, my conclusion is that there is a preponderance of evidence in favor of defendants that the work was done in the manner and to the extent required by law, and that the labor performed by them was reasonably worth the sum of $100. It therefore necessarily follows that the defendants had the entire year of 1902 to do the assessment work for that year, and no lawful relocation could be made by others until January 1, 1903. At the time plaintiff made the relocation of the ground under the name of the Copper King the owners of the Copper Glance claim had the exclusive right to the possession and enjoyment of the mining ground embraced in that location. A relocation on lands actually covered at the time by a valid and sub-

sisting location is void, because the law does not allow such a thing to be done. Belk v. Meagher, supra; Gwillim v. Donnellan, 115 U. S. 45, 49, 5 Sup. Ct. 1110, 29 L. Ed. 348; Manuel v. Wulff, 152 U. S. 505, 511, 14 Sup. Ct. 651, 38 L. Ed. 532; Del Monte M. Co. v. Last Chance M. Co., 171 U. S. 55, 78, 18 Sup. Ct. 895, 43 L. Ed. 72.

Judgment must be entered herein in favor of defendants for their costs.