Argued May 6, decided July 14, 1908.

# FREDRICKS v. KLAUSER.

[96 Pac. 679.]

MINES AND MINERALS — IMPROVEMENT WORK — RELOCATION — FOR-
FEITURE OF ORIGINAL LOCATION—BURDEN OF PROOF.

1. One basing a relocation of a mining claim on the existence of a for-
feiture of the original location by reason of neglect to make the required
improvement, has the burden of establishing the forfeiture, which is *prima
facie* done by proof that no labor was performed within the limits of the
original claim during a specified year, and the burden then shifts to the origi-
nal locator, to show that work performed on an adjacent claim inured to the
benefit of the claim in controversy.

SAME—STATUTES.

2. Under Rev. St. U. S. § 2324 (U. S. Comp. St. 1901, p. 1426), requiring the
making of improvements on each mining claim each year, except where
claims are held in common, the expenditures may be made on any one claim,
only where two or more claims are contiguous and are held in common.

SAME—"IMPROVEMENT."

3. The word "improvement," in Rev. St. U. S. § 2324 (U. S. Comp. St. 1901,
p. 1426), requiring the making of annual improvements on mining claims,
means such an artificial change of the physical conditions of the earth in, on,
or so reasonably near a mining claim as to evidence a design to discover
mineral therein, or to facilitate its extraction, and in all cases the alteration
must be reasonably permanent in character.

SAME.

4. In the development of a mining claim, the maxim that equity regards
as done what was intended, has no application, and material taken to a min-
ing claim and not used cannot be reckoned as an improvement of the claim.

SAME.

5. While the reasonable compensation for the daily service of horses used
in development work of a mining claim may be treated as labor performed in
the development, the sum paid for the purchase of horses cannot be so viewed.

SAME.

6. A locator of a mining claim procured iron rails, a part of which were
used in laying a track in a tunnel on the claim, and the remaining rails were
taken to another mine, under an agreement that they should be returned on
demand. The cost of hauling the rails used on the claim could not be segre-
gated from the payment made. *Held*, that the value of the rails used on the
claim must be estimated in determining the worth of the development work
performed.

SAME.

7. The value of powder, fuse, candles, etc., used in development work of a
mining claim, will be estimated in determining the worth of the work.

SAME.

8. The reasonable value of meals furnished men employed in doing devel-
opment work on a mining claim, who received board in addition to their
wages, should augment the earnings of the men employed, but the money
expended in transporting the supplies is not a proper charge for development
work.

SAME.

9. The worth of rails laid on ties in a tunnel on a mining claim, will be estimated in determining the value of the development work on the claim, but the payment for the rails will be disregarded.

SAME.

10. The price paid for tools used in the development work of a mining claim cannot be considered as development work, although a reasonable compensation for their use may be so considered.

SAME. ·

11. Cutlery, dishes, tinware, groceries, provisions, tobacco, and bedclothing do not constitute an improvement of a mining claim, though candles included in the items and used at a tunnel on the claim may be credited as an expenditure.

SAME.

12. Where there was no machinery or fixtures at a mining claim, which necessitated the employment of a watchman after the development work ceased, the worth of the actual labor of an employee in making an honest effort to discover minerals on the claim, was the only credit to which the locator was entitled, but credit should be allowed for the actual labor which the employee performed.

SAME.

13. Evidence *held* to show that a locator of a group of four mining claims made improvements on one claim during a year, at a legitimate expense of $132, preventing a forfeiture of such claim, but not preventing a forfeiture of the other claims.

From Baker: WILLIAM SMITH, Judge.

Statement by MR. JUSTICE MOORE.

This is a suit by George W. Fredricks against Antone Klauser, to enjoin the continuation of an alleged trespass upon certain real property.

It is averred in the complaint that the plaintiff is the owner and in the possession of two unpatented quartz mining claims in Baker county, known as the "Highland Chief" and the "Gold Dust," particularly describing them, and setting forth the several steps taken to initiate and to maintain a right to the possession of the premises; that about September 10, 1906, the defendant unlawfully pretended to locate a quartz mining claim, which he designated as the "Liberty," the boundaries of which embrace parts of the claims first hereinbefore mentioned; and that he committed on such claims, certain unauthorized acts which he threatens to continue, and, unless restrained, will execute such menace.

The answer denied the material allegations of the complaint, and averred, *inter alia,* that in the year 1905, the plaintiff failed to perform the required amount of assessment work on the mining claims first specified, in consequence of which neglect they became open to relocation, and that no labor thereon or improvement thereof having been resumed by August 25, 1906, the defendant, who then was a duly qualified entryman, made a valid location of the Liberty quartz mining claim, stating the several things that were done to acquire a right to the possession thereof, which acts constitute the trespass of which the plaintiff complains.

The reply denied generally each allegation in the answer, whereupon the cause was referred to a referee, who took and reported the testimony, from which the court found: That the plaintiff had been the owner of the following named mining claims in that county, to-wit: The Spanish Tom, the Highland Queen, the Highland Chief, and the Gold Dust, which constituted a group, and the annual labor had generally been performed upon only one of the claims for the benefit of all of them. That in the year 1905, the value of all the labor performed upon the mining claims, and of the entire improvements made thereto, was less than $100, which expenditure was exclusively appropriated in extending a tunnel in the Highland Chief claim. Other findings of fact were made compatible with the averments of the answer, and, a decree having been rendered, determining that the defendant was the owner and entitled to the possession of the Liberty quartz mining claim, the plaintiff appeals.            MODIFIED, AND DECREE ENTERED.

For appellant there was a brief and an oral argument by *Mr. John L. Rand.*

For respondent there was a brief over the names of *Mr. Hugh E. Courtney* and *Messrs. Hart & Nichols,* with oral arguments by *Mr. Courtney* and *Mr. Julius N. Hart.*

MR. JUSTICE MOORE delivered the opinion of the court.

The plaintiff alleges that, from the time the Highland Chief and the Gold Dust claims were severally located, he and his predecessors in interest annually expended in labor and improvements upon each of such claims a sum in excess of $100. The complaint does not aver that plaintiff owned more than these two claims, or state that in their development they had been treated as a group, upon only one of which claims the annual assessment work had been done for the benefit of both. So far, then, as the plaintiff's primary pleadings sets forth the facts constituting his alleged right to equitable relief, the two claims specified are treated as separate and distinct entities.

The answer does not aver that in 1905 the plaintiff was the owner of the four mining claims specified in the court's findings, or state that any claims owned by him are contiguous, or that in their development they had been treated as a group; but alleges, in substance, that in the year mentioned the plaintiff neglected to expend, in labor or improvement, upon such claims (meaning the Highland Chief and the Gold Dust) or either of them the required amount of $100, nor did he apply such sum upon any adjoining claim, whereby his locations could be sustained. The cause appears to have been tried, however, on the defendant's theory that the four claims mentioned were managed as a group, the development of any integral part of which inured to the benefit of the entire collection. In conformity with such plan, the testimony will be reviewed to determine whether or not it establishes the fact that in the year 1905 development work of the value of $400 was done upon either of the mining claims, so as to prevent a forfeiture of the entire group.

1. The evidence shows that on May 15, 1903, the plaintiff secured a conveyance of four unpatented quartz mining claims in Baker County, known as the "Barthof

Group," which is located nearly in the form of a parallelogram, and extending 3,000 feet southwesterly and 1,200 feet southeasterly from the northeast corner of the collection. The northeast claim is called the Spanish Tom; the northwest the Highland Queen; the southwest the Highland Chief; and the southeast the Gold Dust. A tunnel was commenced in the year 1904, and extended about 90 feet into the side of a mountain, making a subterranean passageway into the Highland Chief mining claim. No further development of either of the mining claims was made until about November 1, 1905, when one S. C. Arbuckle, as plaintiff's agent, resumed labor and improvements which were exclusively expended upon the Highland Chief claim. Arbuckle left the mines May 16, 1906, going to another district, and on August 25 of that year, the defendant claiming that the requisite amount of assessment work for the preceding year had not been done upon either of the claims, attempted to locate the Liberty quartz mining claim and included within its boundaries nearly one-half of the Highland Chief and of the Gold Dust, and also small parts of the Spanish Tom and of the Highland Queen mining claims. The plaintiff's counsel, insisting that no forfeiture of either claim had occurred, offered in evidence receipts for money disbursed by their client during the time specified, amounting to $957.71, and contend that the court erred in finding that the value of the labor performed and of the improvements made in the year 1905 were less than $100. The written acknowledgments of such payments, the receipts for which are grouped in some instances, are as follows: A. Klauser, $37; Charles Wise, $23.95; Joseph Silvers, $1; J. E. Pugh, $142.80; M. Silvers, $139.05; Basche-Sage Hardware Co., $44.52; S. Bond, $22.40; Durkee Mercantile Co., $38.30; and S. C. Arbuckle, $508.69.

To determine what sums of money so paid should be credited on account of development work, the items thus

set forth will be considered in the order stated. The money received by Klauser, $37, was for 14 days' work at the Highland Chief claim, most of which time was employed in extending the tunnel, and the sum so paid should be accounted for as labor performed. Wise earned $23.95 for eight days' similar work. Of this sum $3.95 was paid, evidently at his request, to the Durkee Mercantile Company; and the entire amount is a proper credit.

Joseph Silvers received $1 for moving dirt at the Nineteen Hundred and One mining claim. The defendant's relocation is based upon an alleged forfeiture of the preceding right to the possession of the premises, by reason of neglect to make the required improvement, which averment imposed upon him the burden of establishing the fact of such loss. A *prima facie* case in his favor was made when it appeared that the labor was not performed within the limits of the claim during the year relied upon, whereupon the burden shifted to the plaintiff, making it incumbent upon him to prove that, though the annual assessment or any part thereof was done outside the claim described, the work was performed for and inured to the benefit of such mine: 20 Am. & Eng. Enc. Law (2 ed.) 737; 27 Cyc. 593. As the plaintiff failed to show that the labor performed by J. Silvers was of any benefit to the Bartholf Group, or to any claim thereof, the disbursement of $1 must be rejected.

Pugh received $142.80 for about 3,200 linear feet of timber which, at Arbuckle's request, he secured and hauled to the mining claims in November and December, 1905, a part of which material was used in the tunnel, forming three sets of stulls of five feet each. It is impossible from the transcript before us accurately to determine the value of the timber so used, but the worth thereof will be hereinafter estimated. Some of the timbers were taken from the mining claims pursuant to an agreement to return them when so requested.

2. Excepting the year when a location is made (Chapter 9, 21 U. S. Stat. 61) there must annually be expended not less than $100 in labor or improvement upon each unpatented mining claim located after May 10, 1872. Where, however, two or more contiguous claims are held in common, such expenditure may be made upon any one claim: Rev. St. U. S. § 2324 (U. S. Comp. St. 1901, p. 1426) ; *Gird* v. *California Oil Co.* (C. C.) 60 Fed. 531; *Royston* v. *Miller* (C. C.), 76 Fed. 50.

3. The word "improvement," as thus used, evidently means such an artificial change of the physical conditions of the earth in, upon, or so reasonably near a mining claim, as to evidence a design to discover mineral therein or to facilitate its extraction, and in all cases the alteration must reasonably be permanent in character.

4. Thus in *Honaker* v. *Martin,* 11 Mont. 91 (27 Pac. 397) the owner of a mining claim, not having performed in a certain year the required amount of assessment work, sought to prevent a forfeiture of his right to the possession of the premises by resuming the development early in the succeeding year, paying for that purpose $63 for logs, slabs, and lumber which were taken to the claim, but not used, and it was held that the work had not been resumed in good faith. In the development of a mining claim, the maxim that equity regards as done what was intended, has no application, and hence the timbers which Pugh took to the premises, but were not there used, never became a part of the claims and the value of such material should not be reckoned as an improvement.

5. M. Silvers received $65 for a pair of horses and $74.05 for hauling goods and material to the mines. It is difficult to understand how money disbursed in purchasing horses can be regarded as of any benefit to a mining claim. If the animals had been used in the tunnel to draw cars, or employed at a shaft to raise ore, etc.,

the reasonable compensation for their daily service might be treated as labor performed (*Wright* v. *Killian,* 132 Cal. 56:64 Pac. 98), but the sum of money paid for their purchase cannot be viewed as an expenditure incurred in the development of a mining claim.

6. Some of the material which Silvers took to the mines consisted of about 150 feet of iron rails, a part of which was used in laying a track in the tunnel, and the remaining rails, about 137 feet, were taken to another mine, under an agreement to return them when so requested. The cost of hauling the rails that were used in, and thus became a part of, the mining claim, is a valid expenditure, but, as it is impossible to segregate the sum of money thus applicable from the payment that was made, the value of the rails that were used will be estimated in determining the worth of the tunnel that was extended in 1905.

7. Silvers also took to the mines some powder, fuse, candles, etc., which were used in driving the tunnel, and the cost of transporting such goods will be valued in the manner indicated.

8. The remaining part of the payment made to him was for hauling to the mines supplies, etc., which were there used in furnishing food to the men who were employed in doing development work and who received board in addition to their wages. The reasonable value of the meals provided should augment the earnings of the men so employed, and will be so treated; but the money expended in transporting the supplies is not a proper charge for development work, and the entire claim must be disallowed.

9. The money paid to Basche-Sage Hardware Co., $44.52, was principally for iron rails, some of which were laid on ties placed in the tunnel. The worth of the rails so used will be estimated in determining the value of the extension made to the tunnel, but the payment so made will be disregarded.

10. Bond received $22.40 for · tools, etc., which were taken to the mines where they were used. These implements did not become a part of the mining claims, and, though a reasonable compensation for their use might be considered as development work, the purchase price cannot be so treated, and the payment will be rejected.

11. The Durkee Mercantile Co. received $38.30 for cutlery, dishes, tinware, groceries, provisions, tobacco, bed clothing, etc. Included in the receipted bill with the items noted appear charges for a box of candles sold, $2.85, which, if used at the tunnel, might be credited as an expenditure, and will be so considered in making the estimate adverted to. The other items, however, do not constitute an improvement, and the claim will be dis- allowed.

12. The disbursement to Arbuckle was for. groceries which he bought, $11.55, for money expended in paying for a table cloth, towels, livery hire, feed for horses, and horse shoeing, $11.80, and the remainder, $485.34, was given for the labor and services which he rendered as manager from October 2, 1905, to May 16, 1906. The only item for · which he received payment that should be credited on account of development is the actual work he performed at the mines. He testified that, though he remained at the claims most of the time during the period stated, the labor he performed required from 18 to 25 days' time. There was no machinery or other fix- tures of importance at the mines, the preservation of which necessitated a watchman, when the development work had ceased, and, this being so, the worth of the actual labor performed by Arbuckle in endeavoring to increase the world's wealth by making an honest effort to discover valuable minerals is the only credit to which he is entitled: *Altoona Min. Co.* v. *Integral Min. Co.* 114 Cal. 100 (45 Pac. 1047) ; *Hough* v. *Hunt,* 138 Cal. 142 (70 Pac. 1059 : 94 Am. St. Rep. 17). The entire pay-

ment thus made to him will be rejected, but in estimating the value of the development work done in the year 1905 credit will be allowed for the actual labor which he performed.

13. Giving to the testimony that degree of weight to which we think it is entitled, it unmistakably appears that Klauser and Wise worked at the mines 14 and 8 days, respectively, and that Arbuckle did some work that tended to advance the development. Their combined effort extended the tunnel 27 feet and 6 inches, and cut a drift therefrom 5 feet and 6 inches in length, making a total of 33 feet. The testimony of plaintiff's witnesses is to the effect that the value of such work is $8 a foot, while defendant's witnesses assert that one-half that sum is ample compensation for the labor performed and for all other expenses incurred in connection therewith. Considering the payments made to Klauser and Wise, and the extent of the work done by each in extending the tunnel, we think the testimony of defendant's witnesses preponderates as to the reasonable value of the improvements made to the Highland Chief mining claim in the year 1905; and $132 will be allowed as the entire sum legitimately expended on account of the assessment work, including the labor performed by Arbuckle, and the cost of the timbers, iron rails, powder, fuse, candles, board, and all other material necessary to complete the work in the condition in which it now exists. This conclusion is based upon Arbuckle's testimony, which is to the effect that the defendant in 14 days drove the tunnel 24 feet and 7 inches; and that Wise in 8 days, assisted to some extent by the witness, further extended the subterranean passageways 8 feet and 5 inches. For the performance of such labor Klauser and Wise respectively received $37 and $23.95 and their board, which appears to have reasonably been worth 85 cents a day, thereby augmenting the cost of such labor for 22 days $18.70, and making the

sum which should have been credited to them $79.65, and leaving $52.35 as the value of Arbuckle's labor and the cost at the mines of the rails and timbers that were incorporated in the premises, which credit is, in our opinion, sufficient to cover all the expense incurred. Permitting the utmost credit possible for Arbuckle's work of 18 to 25 days, and considering all other items of expense incurred in extending the tunnel, the outlay for such labor, including the work performed by Klauser and Wise, and of the improvement made, cannot, under any method of computation, equal $400, the sum necessary to have been disbursed in the year 1905 in order to maintain a right to the possession of the Bartholf Group; and hence any theory that may have been adopted at the trial must be unavailing, when the four mining claims are considered as a group. The sum of $132 so allowed for the improvement made is sufficient, however, to prevent a forfeiture of the Highland Chief mining claim upon which the expediture was employed, treating that claim and the Gold Dust as separate and distinct entities as set forth in the complaint, the averment in respect to which must be controlling.

The decree will, therefore, be modified and one entered here enjoining the defendant from interfering in any manner with the possession of the Highland Chief quartz mining claim, and from asserting any right, title, claim, interest, or estate therein by reason of the attempted location of the Liberty quartz mining claim, which is hereby set aside so far only as its boundaries conflict with the Highland Chief quartz mining claim.

MODIFIED: DECREE ENTERED.